UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

KAHANA ROSE EVA CHARLES,

Plaintiff,

-against-

CENTERS FOR HEALTH CARE, LLC, CYRINA BENJAMIN, DAVID GREENBERG, LINDA PONCE, BARBARA ELLIS, AND ISAAC SABO,

Defendants.

**MEMORANDUM & ORDER**
**24-CV-2199 (NGG) (JAM)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Kahana Charles brings this employment action against Defendants the Centers for Health Care, LLC (the "Center"), Cyrina Benjamin, David Greenberg, Linda Ponce, Barbara Ellis, and Isaac Sabo (the "Individual Defendants," together with the Center, "Defendants") alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights Law (the "NYCHRL").[1] (Compl. (Dkt. 1) ¶¶ 156-259.)

Pending before the court is Defendants' fully briefed motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the Complaint.[2] (Mem. of L. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mot.") (Dkt. 44); Mem. of L. in Opp'n to for Summ. J. ("Pl.'s Opp.") (Dkt. 48); Reply Mem. of L. in Further Supp. ("Def.'s Reply") (Dkt. 51).) Defendants move for an order of summary judgment dismissing the Complaint.

[1] *See* 42 U.S.C. § 2000e *et seq.* (Title VII); N.Y. Exec. Law § 290 *et seq.* (the NYSHRL); N.Y.C. Admin. Code § 8-101 *et seq.* (the NYCHRL).

[2] All subsequent references to Rules are to the Federal Rules of Civil Procedure. When quoting cases, unless otherwise noted, all alterations are adopted and all citations, emphases, internal quotation marks, and ellipses are omitted.

For the reasons set forth below, the court finds that Plaintiff has not raised a genuine dispute of material fact to support her discrimination and retaliation claims and GRANTS IN PART Defendants' motion as to those claims. However, the court finds that Plaintiff has raised a genuine dispute of material fact as to her hostile work environment claims and DENIES IN PART Defendants' motion as to those claims. Accordingly, the court also GRANTS IN PART Defendants' motion as to Plaintiff's aiding-and-abetting claims insofar as they derive from her discrimination and retaliation claims, but DENIES IN PART Defendants' motion as to Plaintiff's aiding-and-abetting claims insofar as they derive from Plaintiff's hostile work environment claims.

## I. BACKGROUND[3]

Plaintiff is a transgender woman. (Def.'s 56.1 ("Def.'s 56.1") (Dkt. 47) ¶ 1; Pl.'s R. 56.1 Counter Stmt. ("Pl.'s 56.1") (Dkt. 50) ¶ 1.) In August 2021, she started working for the Center as a

---

[3] The following facts are drawn from the parties' respective E.D.N.Y. Civil Rule 56.1 statements, the true and accurate copies of the documents relied on in, and attached to, those statements, and the parties' briefing. *See* Fed. R. Civ. P. 56.1(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."). Unless otherwise noted, these facts are not in dispute. To the extent an assertion or denial of fact is not supported by admissible evidence, the court disregards that assertion or denial. *See* E.D.N.Y. Civ. R. 56.1(d) ("Each statement by the movant or opponent under Rule 56.1(a) and (b), including each statement denying and controverting any statement of material fact, must be followed by citation to evidence that would be admissible."); *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the [Rule 56.1] Statements, the Court is free to disregard the assertion[s]."), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Certified Nursing Assistant ("CNA"). (*Id.*) During her employment, she reported directly to various Nurse Supervisors, including Defendant Ellis, (Pl.'s 56.1 ¶ 3; Def.'s R. 56.1 Counter Stmt. (Dkt. 52) ¶ 3.), and Defendant Benjamin, the Director of Nursing who oversaw the nursing department. (Pl.'s 56.1 ¶ 3; Def.'s R. 56.1 Counter Stmt. ¶ 3.)

### A. Specific Comments and Individuals that Plaintiff Claims to have Reported to the Individual Defendants

It is undisputed that throughout Plaintiff's time at the Center, she made complaints to the Center's leadership about colleagues making inappropriate comments towards her, including about her transgender status. (Pl.'s 56.1 ¶58; Def.'s 56.1 ¶58). However, the parties dispute whether Plaintiff identified specific individuals when making her complaints. The Individual Defendants each testified that Plaintiff repeatedly refused to provide them with the names of any employees who allegedly made inappropriate comments towards her. (Def.'s 56.1 ¶ 60.) According to Plaintiff, however, she did provide the names of such employees, including verbally identifying certain employees to Defendant Greenberg after he showed her images of employees' work IDs.[4] (Pl.'s 56.1 ¶¶ 60, 164, 166-67.)

Plaintiff says that another CNA employed by the Center named Tenant asked Plaintiff if she was the "famous 'Ms. Charles'" and told Plaintiff that she had learned about Plaintiff's transgender status from "gossip" at the Center. (Pl.'s 56.1 ¶¶ 98-100; Def.'s R.

[4] Although Greenberg denies that Plaintiff identified any individuals to him, (Def.'s R. 56.1 Counter Stmt. ¶¶ 164, 166-167), the court must view the evidence at this stage "in the light most favorable" to Plaintiff because she is "the nonmoving party." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 216 (2015) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The same is true for many facts that the court discusses below.

56.1 Counter Stmt. ¶¶ 98-100.) Plaintiff testified that she complained to Benjamin about Tenant's comments on two separate occasions, but was sent away without any investigation ensuing. (Pl.'s 56.1 ¶¶ 102-107.)

Plaintiff also testified that Simone Grant, another Center employee, said openly and loudly "for everyone to hear" that Plaintiff should never have been hired to be in the union because "that f*gg*t don't do nothing."[5] (Pl.'s Depo. Tr. (Dkt. 49-1) at 226:5-25; Pl.'s 56.1 ¶ 130.) Plaintiff states that she reported Grant's comment to Defendant Ponce, the Human Resources Director. (Pl.'s 56.1 ¶ 131.) Plaintiff testified that Ponce told her that she would "follow up" about Plaintiff's complaint, but never did. (*Id.* ¶ 132.)

Plaintiff submitted a statement to Benjamin complaining that Debra Thomas, a fellow CNA, had told an X-ray technician that Plaintiff was transgender. (Def.'s 56.1 ¶ 63; Pl.'s 56.1 ¶¶ 63, 134-35.) Although Benjamin investigated and found the complaint unsubstantiated, the Center required Thomas to undergo in-service training on teamwork and respecting others. (Def.'s 56.1 ¶ 67; Pl.'s 56.1 ¶ 67.) Benjamin did not speak with the X-ray technician because he was not an employee of the Center and Benjamin did not know his identity. (Def.'s R. 56.1 Counter Stmt. ¶¶ 66, 136.) Plaintiff also sent a letter to Ponce about the incident with Thomas, but Ponce did not take any action on it. (Pl.'s 56.1 ¶¶ 138-39.) Ponce testified that she did not take any action because she did not oversee investigations into employee complaints, and because Benjamin had already completed her investigation by the time that Ponce received the letter. (Def.'s R.

[5] Defendants note that the "testimony Plaintiff cites does not even mention [] Grant and describes what she allegedly said to Sabo." (Def.'s R. 56.1 Counter Stmt. ¶ 130.) Another portion of Plaintiff's Deposition, however, does mention the altercation and quote. (Pl.'s Depo. Tr. at 226:5-25.)

56.1 Counter Stmt. ¶¶ 138-39.) However, Plaintiff points to testimony by Ponce and Greenberg that they were unaware of any investigation by Benjamin.[6] (Pl.'s 56.1 ¶¶ 140, 142.)

Plaintiff had an interaction with a patient, Marlene, who told Plaintiff that she would never consider Plaintiff to be a woman. (Pl.'s 56.1 ¶ 108; Def.'s R. 56.1 Counter Stmt. ¶ 108.) Nickso Martellus, Assistant Director of the Center, witnessed the comment and discussed it with Plaintiff afterwards. (Pl.'s 56.1 ¶ 109; Def.'s R. 56.1 Counter Stmt. ¶ 109.) Plaintiff testified that Martellus told her not to "go near Marlene" and reassigned her so that she no longer needed to care for Marlene. (Pl.'s 56.1 ¶ 110; Def.'s R. 56.1 Counter Stmt. ¶ 110.) Martellus then said that she would report the incident to Benjamin, who Plaintiff believes took no further action. (Pl.'s 56.1 ¶¶ 111-12; Def.'s R. 56.1 Counter Stmt. ¶¶ 111-12.) Plaintiff did not care for Marlene after the incident, but remained responsible for bringing her food. (Pl.'s 56.1 ¶ 113; Def.'s R. 56.1 Counter Stmt. ¶ 113.)

### B. General Complaints Plaintiff Claims to have Raised with the Individual Defendants

Plaintiff also raised general complaints with the Individual Defendants. She had multiple discussions with Defendant Sabo—then-Assistant Hospital Administrator—about employees making fun of her because she was transgender. (Pl.'s 56.1 ¶¶ 143-46, 162; Def.'s R. 56.1 Counter Stmt. ¶¶ 143-46, 162.) On at least three occasions, she complained to Ponce. (Pl.'s 56.1 ¶¶ 147-48; Def.'s R. 56.1 Counter Stmt. ¶¶ 147-48.) Greenberg directed

[6] Defendants point to competing testimony in which they claim that Greenberg discussed with Benjamin and Ponce the need to investigate. (Def.'s R. 56.1 Counter Stmt. ¶ 142.) Those citations, however, selectively quote Greenberg's testimony. He stated that he "honestly can't recall" what he had said to Benjamin and Ponce, but that he "probably" discussed the need to "address what's going on over here." (Greenberg Tr. (Dkt. 49-4) at 45:11-17.)

Ponce to draft a statement titled "Note To File," stating that Plaintiff had approached Ponce regarding general complaints. (Pl.'s 56.1 ¶¶ 149-150; Def.'s R. 56.1 Counter Stmt. ¶¶ 149-150.) Greenberg, however, did not have further discussions with Ponce regarding the Plaintiff's complaints. (Pl.'s 56.1 ¶ 151; Def.'s R. 56.1 Counter Stmt. ¶ 151.) Plaintiff also had a separate conversation with Greenberg in which she told him that she was generally being "harassed" and "alienated" in her unit by other employees. (Pl.'s 56.1 ¶ 165; Def.'s R. 56.1 Counter Stmt. ¶ 165.)

Similarly, Plaintiff told Ellis about issues she was experiencing at the Center, including being called a "male" and not being accepted for her "gender." (Pl.'s 56.1 ¶ 152; Def.'s R. 56.1 Counter Stmt. ¶ 152.) Ellis testified that each time Plaintiff told her about these issues, she told Plaintiff to talk to Benjamin. (Pl.'s 56.1 ¶ 153; Def.'s R. 56.1 Counter Stmt. ¶ 153.) The parties disagree as to whether Plaintiff spoke to Benjamin to complain more generally about her work environment and discrimination. (Pl.'s 56.1 ¶¶ 154-55; Def.'s R. 56.1 Counter Stmt. ¶¶ 154-155.) Regardless, Plaintiff testified that she felt "nothing was being done" when she complained to Benjamin and Sabo because they did not call her in to discuss her complaints. (Pl.'s 56.1 ¶ 161.)

### C. Altercations Involving Plaintiff that Individual Defendants Investigated

Plaintiff was also involved in at least four verbal altercations during her time at the Center. This section addresses the first three; and the fourth, which led to her termination, is addressed below. *Infra* Section I.D.

The first altercation occurred on October 8, 2021 between Plaintiff and Nurse Latoya Meikle. (Def.'s 56.1 ¶¶ 5-6; Pl.'s 56.1 ¶¶ 5-6.). At the time of the incident, Meikle did not know that Plaintiff was transgender and Plaintiff did not report that Meikle made any discriminatory comments during the altercation. (Def.'s 56.1 ¶¶ 6, 8; Pl.'s 56.1 ¶¶ 6, 8.) However, during the altercation with

Meikle, Plaintiff maintains that another CNA—Laudanie Louis-saint—pressed up against Plaintiff's buttocks because she was transgender. (Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶¶ 9, 88, 91; Def.'s R. 56.1 Counter Stmt. ¶ 91.) Benjamin investigated, including taking statements from Plaintiff and Meikle. (Def.'s 56.1 ¶ 7; Pl.'s 56.1 ¶ 7.) Plaintiff testified that she disclosed her transgender status to Benjamin for the first time during that meeting. (Pl.'s 56.1 ¶ 90.) Prior to this incident, no one had made complaints about Plaintiff or raised allegations of misconduct against her with Benjamin. (Pl.'s 56.1 ¶¶ 96-97; Def.'s R. 56.1 Counter Stmt. ¶¶ 96-97.) Following the investigation, Benjamin issued a Disciplinary Action Form ("DAF") to Plaintiff, stating that Plaintiff acted "unacceptib[ly]" by "using profanity and making threats" and issuing her a written warning. (Pl.'s 56.1 ¶12-13; Def.'s R. 56.1 Counter Stmt. ¶¶ 12-13.) Meikle received a "nearly identical DAF to the one Plaintiff received." (Def.'s 56.1 ¶ 15; Pl.'s 56.1 ¶ 15.) Plaintiff, however, refused to sign the DAF because she did not agree that its contents were accurate. (Def.'s 56.1 ¶¶ 14, 92; Pl.'s 56.1 ¶¶ 14, 92.)

The second altercation occurred on March 16, 2022 between Plaintiff and another CNA, Judith Noel, in the Center's shower room. (Def.'s 56.1 ¶¶ 17, 114; Pl.'s 56.1 ¶¶ 17, 114.) During that argument, Plaintiff states that Noel told her "you think you are a real woman, but you went to surgery and had a vaginoplasty." (Pl.'s 56.1 ¶¶ 18, 114, 118-19.) Noel denies making this statement. (Def.'s R. 56.1 Counter Stmt. ¶¶ 114, 118-19.) After the incident, both gave statements to Human Resources. (Def.'s R. 56.1 Counter Stmt. ¶¶ 18, 115-17; Pl.'s 56.1 ¶¶ 115-17.) Benjamin again investigated, but determined that because it was Plaintiff's word against Noel's, she could not move forward other than by giving both individuals a code of conduct training. (Pl.'s 56.1 ¶¶ 18-19, 120-22; Def.'s R. 56.1 Counter Stmt. ¶¶ 19, 120-22.) Plaintiff also claims that she reported Noel calling Plaintiff gay and stating her dislike for "LGBT" individuals. (Pl.'s 56.1 ¶¶

156-60.) Defendants deny that Plaintiff identified Noel by name. (Def.'s R. 56.1 Counter Stmt. ¶¶ 156-60.)

Plaintiff's third altercation occurred the following month, April 2022, with Nurse Ezra Rowe. (Def.'s 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.) Benjamin testified that during her investigation of this incident she spoke with Plaintiff and at least seven other witnesses. (Def.'s R. 56.1 Counter Stmt. ¶ 21.) Plaintiff contends that Benjamin only spoke with her after the Center had already determined to discipline her and that she received a "write-up" at the same time.[7] (Pl.'s 56.1 ¶¶ 21, 123.) Benjamin determined that Plaintiff had acted inappropriately and unprofessionally by "yelling [and] carrying on very loudly on the unit, in the resident care area."[8] (Def.'s 56.1 ¶ 22; Pl.'s 56.1 ¶ 22; Def.'s R. 56.1 Counter Stmt. ¶ 124.)

### D. Actions that the Center Took to Address Plaintiff's Complaints and Altercations

At this point, all agree that the Center took at least some action to address Plaintiff's complaints. On June 27, 2022, Plaintiff met with Greenberg, Benjamin, Ponce, Sabo, and a representative from 1199 SEIU United Healthcare Workers East ("the Union"). (Def.'s 56.1 ¶ 68; Pl.'s 56.1 ¶ 68; Def.'s R. 56.1 Counter Stmt. ¶ 161.) The meeting was held to address Plaintiff's complaints of

---

[7] The "write-up" that Plaintiff refers to appears to be her DAF, which she received on May 4, 2022, and which stated that Plaintiff's behavior was "unacceptable" and "impacts negatively." (Def.'s 56.1 ¶ 24; Def.'s R. 56.1 Counter Stmt. ¶ 24.)

[8] Two other incidents purportedly occurred in 2022. The first involved a complaint from a resident's family member about Plaintiff. (Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) The second arose from a dispute with Nurse Melissa Dyer. (Def.'s 56.1 ¶ 28; Pl.'s 56.1 ¶ 28.) An Assistant Director of Nursing witnessed the exchange and wrote a statement attesting that Plaintiff and Dyer "had a loud verbal dispute at the nursing station" that "was very unprofessional." (Def.'s 56.1 ¶¶ 29, 31; Pl.'s 56.1 ¶¶ 29, 31.)

harassment and inappropriate comments from colleagues, including about her transgender status. (Def.'s 56.1 ¶ 68; Pl.'s 56.1 ¶ 68; Def.'s R. 56.1 Counter Stmt. ¶ 161.) The parties dispute whether Plaintiff gave the names of anyone who made those comments. (Pl.'s 56.1 ¶¶ 70, 171; Def.'s R. 56.1 Counter Stmt. ¶¶ 70, 171.) Plaintiff testified that Greenberg showed her images of employees' work IDs and she identified individuals who made discriminatory comments towards her, which Defendants deny. (Pl.'s 56.1 ¶¶ 166-67; Def. R. 56.1 Counter Stmt. ¶¶ 166-67.)

Defendants contend that during the June 2022 meeting, Greenberg asked Plaintiff if there was anything the Center could do to make her workplace environment more comfortable and less stressful. (Def.'s 56.1 ¶ 71; Def.'s R. 56.1 Counter Stmt. ¶ 71.) Plaintiff testified that Greenberg said he could not do anything about her complaints, and could not "ban everybody," and told her that "if you're feeling that [the Center] is not a safe place for you to work [], then you should find another place to work." (Pl.'s 56.1 ¶¶ 71, 168-69.) Defendants claim that Plaintiff takes these statements out of context, or that Greenberg did not say them at all. (Def.'s R. 56.1 Counter Stmt. ¶¶ 168-69.)

Plaintiff testified that after the meeting there was no "decision" made, no investigation pending, and no discussion of next steps or actions. (Pl.'s 56.1 ¶¶ 172-73, 177-78.) Greenberg testified that this was because he was left with the impression that Plaintiff would let them know whether she would be happier working at a different facility, whether she wanted to change her shift, or whether she had any other suggestions for addressing the difficulties she allegedly was experiencing. (Pl.'s 56.1 ¶¶ 172-73, 176; Def.'s R. 56.1 Counter Stmt. ¶¶ 172-173, 176.) Sabo and Benjamin similarly testified that neither of them was assigned any task or responsibility concerning Plaintiff's complaints after the meeting. (Pl.'s 56.1 ¶¶ 174-75; Def.'s R. 56.1 Counter Stmt. ¶¶ 174-75.)

Plaintiff testified that she sent a follow-up letter the next day (the "June 28th Letter"), and produced the letter allegedly written in June 2022 in discovery. (Pl.'s 56.1 ¶¶ 180-81.) In the June 28th Letter, Plaintiff purportedly "follow[ed] up with the meeting [and] investigation" and stated that Greenberg could have made sure that the work environment at the Center was "free" from being "judge[d], harassed, or hostile." (*Id.* ¶¶ 72, 180-81.) The letter also stated that "if action were taken . . . from the start," she would not have been a victim of "depression, anxiety" or feel "uncomfortable." (*Id.* ¶¶ 72, 182.) Defendants, however, contend that the Center "never received" Plaintiff's June 28th Letter, pointing to Benjamin's testimony. (Def.'s R. 56.1 Counter Stmt. ¶ 72, 180.) Plaintiff points to Ponce's testimony that Greenberg gave her the June 28, 2022 letter "to put in [Plaintiff's] chart"—though Ponce did not discuss the contents of the letter with Greenberg or with Plaintiff. (Pl.'s 56.1 ¶¶ 184-85.)

Plaintiff also sent an additional letter two days after the meeting (the "June 29th Letter"), which she also produced in discovery. (Def.'s 56.1 ¶ 73; Pl.'s 56.1 ¶¶ 73, 183.) The June 29th Letter reiterated Plaintiff's concerns about discrimination relating to her gender identity but neither named any individuals who allegedly harassed her nor suggested any actions she wished the Center to take. (Def.'s R. 56.1 Counter Stmt. ¶ 73.) Benjamin instructed Ponce to place the letter in Plaintiff's chart. (Pl.'s 56.1 ¶ 187; Def.'s R. 56.1 Counter Stmt. ¶ 187.) But, as with the June 28th Letter, Benjamin and Ponce did not discuss the contents further. (Pl.'s 56.1 ¶ 188; Def.'s R. 56.1 Counter Stmt. ¶ 188.)

That September, the Center held a series of mandatory town hall meetings (the "Town Halls"). (Def.'s 56.1 ¶ 74.) Defendants maintain that during the Town Halls the Center retrained staff on its anti-discrimination and anti-harassment policies, as well as employee tolerance and acceptance. (*Id.*) Plaintiff disagrees. (*Id.*) Plaintiff testified that these were merely listed as "talking points"

ahead of the meeting but not "discussed" at the one she attended. (*Id.*; Pl.'s 56.1 ¶¶ 206-207.) Instead, she contends that "lateness" and "abuse" were the topics discussed. (Def.'s 56.1 ¶ 74; Pl.'s 56.1 ¶ 208.) Plaintiff further asserts, pointing to Greenberg's testimony, that the Center held the meetings because it "just had to show [Plaintiff] that [it was] doing something" in response to her complaints. (Def.'s 56.1 ¶ 74; Pl.'s 56.1 ¶ 209) Defendants point to competing testimony from Benjamin and Greenberg, who were presenters at the Town Halls, that anti-discrimination and anti-harassment policies, and employee tolerance and acceptance were topics covered during each town hall meeting. (Def.'s R. 56.1 Counter Stmt. ¶¶ 74-75, 206-209.)

Plaintiff testified that she continued to complain about her coworkers between June 2022 and March 2023, when she was terminated. (Pl.'s 56.1 ¶ 190.) Defendants note that Plaintiff has provided no documentation beyond her own testimony of raising complaints other than the incidents that Benjamin was already investigating. (Def.'s R. 56.1 Counter Stmt. ¶ 190.)

### E. Plaintiff's Final Altercation with McNeil that Led to Her Termination

Several months after the Town Halls, on March 11, 2023, Plaintiff had an altercation with another CNA, Crystal McNeil. (Def.'s 56.1 ¶ 34; Pl.'s 56.1 ¶ 34.) Defendant Ellis, who was on the other side of the floor when the altercation occurred, reported hearing a "very loud commotion" and seeing Plaintiff trying to move toward McNeil. (Def.'s 56.1 ¶¶ 35-37; Pl.'s 56.1 ¶¶ 35-37.) Ellis attempted to physically restrain Plaintiff. (Def.'s 56.1 ¶ 37; Pl.'s 56.1 ¶ 37.) According to Plaintiff, the incident began with McNeil yelling at her and calling her a "f**king f*gg*t" and a "gay a*s." (Pl.'s 56.1 ¶¶ 37-38, 192-193, 196.) Plaintiff maintains that she

went to report McNeil's comments to Nurse Powell, but that Powell was unreceptive.[9] (*Id.* ¶¶ 37-38, 194-196.) McNeil then purportedly continued to harass Plaintiff, who eventually responded. (*Id.* ¶¶ 37-38, 195.) Plaintiff states that her response did not involve profanity; but Powell stated that Plaintiff had a "loud verbal outburst." (*Id.* ¶ 198; Def.'s R. 56.1 Counter Stmt. ¶ 198.) Ellis stated the same. (Pl.'s 56.1 ¶ 198.)

Plaintiff then testified that she was pulled aside and advised to "stop" and immediately complied.[10] (*Id.* ¶¶ 37-38, 199; *see also* Def.'s R. 56.1 Counter Stmt. ¶ 200.) Ellis, however, testified that she tried to physically restrain Plaintiff and move her into a different room to avoid a physical altercation. (Def.'s R. 56.1 Counter Stmt. ¶ 199.) Plaintiff testified that McNeil continued to yell at Plaintiff and that no one tried to stop McNeil. (Pl.'s 56.1 ¶ 200.) A staff member who witnessed the event called security, who escorted both Plaintiff and McNeil out of the building. (Def.'s 56.1 ¶¶ 39-40; Pl.'s 56.1 ¶¶ 39-40.) Both were immediately suspended pending further investigation by Benjamin. (Def.'s 56.1 ¶¶ 41-42; Pl.'s 56.1 ¶¶ 41-42.)

Benjamin conducted an investigation into the incident, which included collecting and reviewing at least ten witness statements and speaking with Plaintiff, McNeil, and other witnesses. (Def.'s 56.1 ¶ 43; Pl.'s 56.1 ¶ 43.) Plaintiff's written statement did not mention McNeil making discriminatory comments, but Plaintiff maintains that she mentioned McNeil's alleged discriminatory comments to Powell verbally. (Pl.'s 56.1 ¶¶ 44, 194, 196.) Benjamin consulted with Greenberg and Ponce, and then terminated both Plaintiff and McNeil's employments. (Def.'s 56.1 ¶¶ 45, 49;

[9] In her deposition, Plaintiff testified that Powell was "the charge nurse on [her] floor." (Pl.'s Depo. Tr. (Dkt. 49-1) at 176:16-18.)

[10] Although Plaintiff notes in her Rule 56.1 statement that Benjamin had pulled her aside, she testified in her deposition that it was Ellis who did so. (Def.'s R. 56.1 Counter Stmt. ¶¶ 37-38.)

Pl.'s 56.1 ¶¶ 45, 49.) Plaintiff was issued a termination notice describing the incident and explaining the Center's finding that she was culpable, which she refused to sign. (Def.'s 56.1 ¶¶ 47-48; Pl.'s 56.1 ¶¶ 47-48.) Plaintiff testified that the notice did not accurately describe the incident and that she "did nothing wrong." (Pl.'s 56.1 ¶¶ 202-203.) Further, she claims that her termination was retaliation for "defend[ing]" herself against McNeil and others. (Pl.'s 56.1 ¶ 214.)

The Union grieved both Plaintiff and McNeil's terminations. (Def.'s 56.1 ¶¶ 51, 54; Pl.'s 56.1 ¶¶ 51, 54.) With regard to Plaintiff, the Center offered to reinstate her, with the condition that Plaintiff sign an agreement indicating that, among other things, any further "violation of issues pertaining to Unprofessional Conduct/Failure to Follow Policy & Procedure and Breach of Work Rule by [Plaintiff] within twenty-four (24) months from the date of [the] Agreement shall constitute just cause for discharge." (Def.'s 56.1 ¶ 52; Pl.'s 56.1 ¶ 52.) Benjamin testified that prior to Plaintiff's termination, she had never included a "last chance provision" as part of an employee's discipline. (Pl.'s 56.1 ¶¶ 216-19; Def.'s R. 56.1 Counter Stmt. ¶¶ 216-19.) Plaintiff rejected the Center's offer. (Def.'s 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.) Plaintiff testified that she did so because she did not wish to return to a work environment in which she had faced discriminatory comments and nothing was being done to address them. (Pl.'s 56.1 ¶¶ 53, 210.) She further testified that she was "afraid" that if she returned, the "same thing" would happen again. (*Id.* ¶¶ 54, 212.) Plaintiff also testified that the agreement's language gave Plaintiff the impression that "if she were attacked by her coworkers and forced to defend herself and her rights in the near future," she would again be terminated. (*Id.* ¶ 215.)

By contrast, McNeil's termination was converted to a six-week suspension. (*Id.* ¶¶ 57, 204.) Greenberg testified that the Union

asked that the Center show "understanding" toward McNeil because the incident was her first disciplinary action. (Pl.'s 56.1 ¶ 205; Def.'s R. 56.1 Counter Stmt. ¶ 56.) McNeil was not offered a "last chance agreement" comparable to the one presented to Plaintiff. (Pl.'s 56.1 ¶ 217; Def.'s R. 56.1 Counter Stmt. ¶ 217.)

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, "once such a showing is made, the nonmovant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 108 (2d Cir. 2023) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* The court must construe the evidence at this stage "in the light most favorable to . . . the nonmoving party." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 216 (2015) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). However, on summary judgment, the court's role is not to "weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact," but rather to "determine whether there are issues to be tried." *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). "Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." *Id.*

## III. DISCUSSION

Plaintiff brings four sets of claims. She alleges three claims against the Center under Title VII, the NYSHRL, and the NY-CHRL: (1) discrimination, (2) a hostile work environment, and (3) retaliation. (Pl.'s Opp. at 13-26.) She also alleges aiding-and-abetting claims against the Individual Defendants under the NYSHRL and the NYCHRL. (*Id.*) As explained below, Plaintiff has raised genuine issues of material fact as to her hostile work environment claims, but not as to her discrimination or retaliation claims.

### A. Discrimination Claims

Plaintiff's discrimination claims are based on the Center's decision to terminate her employment but not McNeil's after their March 2023 altercation. (Pl.'s Opp. at 14-16.) Plaintiff contends that she was treated differently than her "similarly situated non-transgender colleague," McNeil, and was terminated "under circumstances giving rise to an inference of discrimination based on her sex, gender, and sexual orientation." (*Id.*) The court first addresses Plaintiff's Title VII discrimination claim before turning to her NYSHRL and NYCHRL discrimination claims.

#### 1. Title VII Claim

Under Title VII, it is unlawful "for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, Discrimination claims can be based on "disparate treatment" or "disparate impact." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003); *see Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (citing 42 U.S.C. § 2000e). Disparate-treatment cases arise if "an employer has treated a particular person less favorably than others because of a protected trait." *Ricci*, 557 U.S. at 577. Such a plaintiff "must establish 'that the defendant had a discriminatory

intent or motive' for taking a job-related action." *Id.* (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985-86 (1988)).

Courts analyze Title VII discrimination claims under the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Under the first step of this framework, the plaintiff must establish a *prima facie* case by producing evidence that she "(1) is a member of a protected class; (2) was performing [her] duties satisfactorily; (3) was discharged; and that (4) [her] discharge occurred under circumstances giving rise to an inference of discrimination on the basis of [her] membership in the protected class."[11] *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000); *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (calling this burden "minimal").

A plaintiff may establish an inference of discrimination by showing that her employer treated her less favorably than a "similarly situated" employee outside of her protected group. *Graham*, 230 F 3d. at 39. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Id.* To establish an inference of discrimination, a plaintiff must show that she was "similarly situated" in "all material respects" to the comparator employee. *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir.

---

[11] Both parties frame the second *Graham* element more permissively, requiring only that the plaintiff show "she was qualified for the position she held." (*See* Def.'s Mot. at 11 (quoting *Mercedes v. New York City Dep't of Educ.*, 779 F. App'x 44, 45 (2d Cir. 2019) (summary order)); Pl.'s Opp. at 13 (quoting *McConkey v. Churchill Sch. & Ctr.*, No. 24-CV-6091 (LJL) 2025 WL 2062195, at *7 (S.D.N.Y. Jul. 23, 2025)).) The court need not resolve whether that formulation governs Title VII wrongful termination claims at the summary judgment stage. *Cf. Littlejohn v. City of New York*, 795 F.3d 297, 307 (2015) (applying that standard at the motion to dismiss stage); *McDonnell Douglas*, 411 U.S. at 802 (applying it in a failure-to-hire case). As explained below, Plaintiff's claim fails at the pretext stage regardless.

2014) (quoting *Graham*, 230 F.3d at 39). Although what constitutes "all material respects" will vary from case to case, the touchstones are "whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards" and "whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham*, 230 F.3d at 39. Their "circumstances must bear a 'reasonably close resemblance,' but need not be 'identical.'" *Brown*, 756 F.3d at 230 (quoting *Graham*, 230 F.3d at 39).

If the plaintiff establishes a *prima facie* case, then, under the second step of the *McDonnell Douglas* analysis, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employer's decision. 411 U.S. at 802. The defendant "must clearly set forth, through the introduction of admissible evidence, the reasons for the [employment decision]." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).

If the defendant succeeds in articulating a non-discriminatory reason, under the third step of the *McDonnell Douglas* analysis, the burden shifts back to the plaintiff to show that the defendant's employment decision was "more likely than not" based, "in whole or in part," on discrimination." *Bart v. Gulab Corp.*, 96 F.4th 566, 576 (2d Cir. 2024) (quoting *Walsh v. New York City Housing Auth.*, 828 F.3d 70, 75 (2d Cir. 2016)); *see Namibar v. Cent. Orthopedic Grp.*, 158 F.4th 349, 363 (2d Cir. 2025). The plaintiff can satisfy this burden in two ways. The first is to establish that the defendant's proffered explanation is pretextual (i.e. false) "by showing that [its] proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Here, a showing that similarly situated employees outside the plaintiff's protected group "received more favorable treatment" can suffice. *Graham*, 230 F.3d at 43 (citing *Hargett v. Natal Westminster Bank, USA*, 78 F.3d 836, 839 (2d Cir. 1996)). The second is to show that even if the employer's explanation was not pretextual, discrimination

was at least one "motivating factor" in the employer's adverse employment decision. *Bart*, 96 F.4th at 570.

The court finds that Plaintiff succeeds in establishing a *prima facie* case under *McDonnell Douglas*, but fails to meet her burden under the third step of *McDonnell Douglas* to show either that Defendants' proffered non-discriminatory reason for her termination was pretextual or that discrimination was a motivating factor in Defendant's decision to terminate her. 411 U.S. at 802-03.

The parties disagree as to whether Plaintiff has satisfied the fourth element of her *prima facie* case—that the adverse action took place under circumstances "giving rise to an inference of discrimination." [12]

Plaintiff argues that her termination "giv[es] rise to an inference of discrimination" based on her sex, gender, or sexual orientation because the Center fired her but not McNeil—a non-transgender employee—following their involvement in the same altercation. 230 F.3d at 38; (Pl.'s Opp. at 14). Plaintiff contends that she and McNeil were "similarly situated" in "all" material "respects" because both were "employed as CNAs" at the Center, both were "subject to the same workplace standards," and both were "accused of 'unprofessional conduct'" arising from the same incident. (Pl.'s Opp. at 14-15 (quoting Def.'s 56.1 ¶ 77).) Plaintiff further contends that McNeil's conduct was not only of "comparable seriousness" to her own, but was in fact more serious because McNeil directed "discriminatory epithets" at Plaintiff during the altercation while Plaintiff "did not return the same."

[12] Defendants do not dispute that Plaintiff has satisfied the first three *Graham* elements of her *prima facie* case. *See* 230 F.3d at 38; (Pl.'s Opp. at 14 n.12; Def.'s Reply at 1). As noted, the court expresses no view on whether to adopt the more permissive formulation of the second Graham element that both parties endorse. *See* 230 F.3d at 38; (Def.'s Mot. at 11; Pl.'s Opp. at 14).

*Graham*, 230 F.3d at 38; (Pl.'s Opp. at 15 (citing Def.'s 56.1 ¶¶ 200-202; Pl.'s 56.1 ¶¶ 192-98, 200-02)).

Defendants argue that Plaintiff has failed to establish that the adverse action took place under circumstances "giving rise to an inference of discrimination." *Graham*, 230 F 3d. at 38; (*See* Def.'s Mot. at 12-14.) Defendants point to the absence of any discriminatory statements made by the Center's leadership regarding Plaintiff's transgender status. (Def.'s Mot. at 13.) Defendants also point to the fact that Plaintiff was not replaced by any other employee, transgender or otherwise. (*Id.*) With respect to the differential treatment between Plaintiff and McNeil, Defendants acknowledge that while both were initially discharged, McNeil's termination was subsequently "converted to a six-week suspension," whereas Plaintiff "was presented with a Last Chance Agreement in order to be reinstated." (Def.'s Mot. at 14 (citing Def.'s 56.1 ¶¶ 52, 57).) Defendants assert that this difference reflects the fact that McNeil and Plaintiff were not "similarly situated" because Plaintiff "had received multiple written warnings and verbal counselings prior to her altercation with McNeil, whereas McNeil was never disciplined previously." (*Id.* (citing Def.'s 56.1 ¶¶ 12, 23, 30-33, 55-56); Reply at 2.) While that distinction is relevant to the analysis of whether Defendants' proffered rationale is pretextual, it does not defeat Plaintiff's *prima facie* case. Plaintiff and McNeil were still "subject to the same performance evaluation and discipline standards" even if their disciplinary histories differed, and a comparator need not be "identical" to be similarly situated. *Graham*, 230 F.3d at 39, 40. Plaintiff therefore meets the "minimal" burden necessary to establish her *prima facie* case. *See Hicks*, 509 U.S. at 506.

Defendants have met their burden under *McDonnell Douglas*'s second step to offer a "legitimate, nondiscriminatory reason" for differential treatment. *See McDonnell Douglas*, 411 U.S. at 802. They contend that Plaintiff's behavior during her altercation with

McNeil (which occurred in the presence of "staff, residents, and family of residents") was "unacceptable by any objective measure," and that the decision to terminate her was made following Benjamin's "thorough investigation" of the incident. (Def.'s Mot. at 14 (citing Def.'s 56.1 ¶¶ 37, 39-43, 45).) Defendants also argue that the more lenient treatment of McNeil was justified by her clean disciplinary record as compared to Plaintiff's history of "warnings and verbal counselings." (*See* Def.'s Mot. at 14; Reply at 2.) It is undisputed that McNeil, unlike Plaintiff, did not have any prior instances of written discipline. (Def.'s 56.1 Counter Stmt. ¶ 55.) Because "evidence of employee misconduct" may support "a legitimate, non-discriminatory reason for [Plaintiff's] termination," Defendants have met their burden. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010).

At *McDonnell Douglas*'s third step, Plaintiff fails to produce evidence sufficient to show either that Defendants' stated reasons are pretextual or that discrimination was a motivating factor in her termination. *See Bart*, 96 F.4th at 576. Plaintiff argues that the disciplinary incidents prior to the McNeil altercation are "based on contested facts," *see* (Pl.'s Opp. at 16); *supra* Section I.C, but the truth of the underlying events leading to those disciplinary actions is immaterial to the question of whether Defendants were motivated by Plaintiff's disciplinary record when deciding to terminate her. *See McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006). Plaintiff also emphasizes that the Center disciplined and ultimately terminated her despite having "knowledge" of McNeil's and others' discriminatory statements towards her during the altercation and prior incidents. (Pl.'s Opp. at 16); *supra* Sections I.C, E. However, Defendants having knowledge of discriminatory statements by other employees is not proof that the Center *itself* had a discriminatory motive when dismissing Plaintiff. *See Bart*, 96 F.4th at 570. Nor would that render the Center's stated rationale for terminating Plaintiff—her own misconduct during the McNeil

incident and prior disciplinary history—"unworthy of credence." *See Burdine*, 450 U.S. at 253; *Bart*, 96 F.4th at 576. Thus, Plaintiff has not rebutted the Center's stated rationale for her termination.

Because Plaintiff has not raised a "genuine issue" of fact to rebut Defendants' nondiscriminatory reason for her termination, her Title VII discrimination claim cannot survive summary judgment.

2. NYSHRL and NYCHRL Claims Against the Center

Plaintiff's discrimination claims under the NYSHRL and the NYCHRL fare no better.

NYSHRL discrimination claims are "analyzed identically" to Title VII claims. *Cooper v. New York State Dep't of Lab.*, 819 F.3d 678, 680 n.3 (2d Cir. 2016). Because Plaintiff has failed to raise genuine issues of material fact under Title VII, she has similarly failed to do so under the NYSHRL. *Smith*, 196 F.3d at 363 n.1.

NYCHRL discrimination claims must be analyzed independently, and are construed more favorably to plaintiffs than Title VII claims. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Under the NYCHRL, to defeat summary judgment, a "plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason." *Id.* at 110 n.8. A defendant is entitled to summary judgment "only if the record establishes as a matter of law that 'discrimination play[ed] *no* role' in its actions." *Id.* (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38, 40 n.27 (1st Dep't 2009) (emphasis in original)). Even under this more permissive standard however, Plaintiff's NYCHRL claim fails. Plaintiff argues that the record contains evidence that she was treated "less well" than McNeil because of her transgender status, and points to portions of the record showing that Plaintiff was given a "last chance agreement," which Benjamin had never included as part of an employee's discipline, and which was not included in McNeil's final discipline. (Pl.'s Opp. at 17 (citing Pl.'s 56.1 ¶¶ 216-19).)

But evidence of differential treatment alone is insufficient; Plaintiff must tie that differential treatment "at least in part" to "a discriminatory reason." *Mihailik*, 715 F.3d 110 n.8; (*See* Def.'s Mot. at 16). Because she has not shown that the Center's offer of a "last chance agreement" was because of her transgender status, her NYCHRL discrimination claim also fails.

* * *

Accordingly, the court grants Defendants' motion for summary judgment on all Plaintiff's discrimination claims.

### B. Hostile Work Environment Claims

Plaintiff's hostile work environment claims rest on the Center's failure to address the persistent harassment she faced due to her transgender status. As the court explains below, Plaintiff has presented triable hostile work environment claims under Title VII, the NYSHRL, and the NYCHRL.

#### 1. Title VII Claim

For a plaintiff's hostile work environment claim to survive summary judgment, a plaintiff must make two showings: (1) that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) that there is a "specific basis for imputing the conduct creating the hostile work environment to the employer. *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009). Further, it is "axiomatic" that the plaintiff also must show that the hostile conduct occurred "because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015). Where, as here, the alleged harassers are not the plaintiff's supervisor, the plaintiff satisfies the second requirement by showing that her employer "was negligent in failing to prevent harassment from taking place." *Vance v. Ball State Univ.*, 570 U.S. 421, 448-49 (2013). "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a

system for registering complaints, or effectively discouraged complaints from being filed" is all "relevant" to assessing such negligence. *Id.* at 449.

Plaintiff has satisfied the first requirement. She has developed a record of instances of abuse from her coworkers due to her transgender status. Plaintiff testified that CNA Tenant, for example, told Plaintiff that employees were "gossip[ing]" about her transgender status." (Pl.'s Opp. at 17-18 (citing Pl.'s 56.1 ¶¶ 98-100); Def.'s R. 56.1 Counter Stmt. ¶¶ 98-100.) Grant called Plaintiff a "f*gg*t" in the workplace. (Pl.'s Opp at 18 (citing Pl.'s 56.1 ¶ 130).) CNA Thomas discussed Plaintiff's gender identity with an X-Ray technician, "reveal[ing]" her gender identity, and asking the technician why he was "flirting with [Plaintiff]" if she "was born a man . . . she had the surgery." (*Id.* at 19 (citing Pl.'s 56.1 ¶¶ 133-34).) CNA Noel told Plaintiff "you think you are a real woman, but you went to surgery and had a vaginoplasty." (Pl.'s 56.1 ¶¶ 114).) Plaintiff has produced evidence demonstrating "sufficiently severe or pervasive" harassment due to her transgender status. *Duch*, 588 F.3d at 762.

The parties' core disagreement lies in whether Plaintiff can impute that harassment to the Center. *See Vance*, 570 U.S. at 448-49. Defendants maintain that any harassment cannot be imputed to the Center. Defendants argue that Plaintiff made only one complaint about a specific employee (her complaint about Thomas which was addressed by the Town Halls at which employees received anti-discrimination training), but otherwise "did not identify any specific employees who purportedly made inappropriate comments," despite Defendants' repeated requests that she do so (Def.'s Mot. at 17-18 (citing Def.'s 56.1 ¶ 60).) According to Defendants, Plaintiff's "unwillingness" to provide the Center "with the information needed to investigate her complaints and . . . take corrective action" precludes liability. (*Id.* at 18 (citing *Shokry v. Trigen Energy Corp.*, No. 04-CV-1279 (SCR),

2006 WL 44099, at *4 (S.D.N.Y. Jan. 9, 2006)).) Plaintiff maintains that she did identify specific individuals on at multiple occasions. (Pl.'s Opp. at 18-19 (citing Pl.'s 56.1 ¶¶ 136-37, 160-78).) Specifically, Plaintiff testifies that she identified offending individuals to Greenberg verbally by looking at employees' "badges or "[work] IDs" and identifying who made the specific comments. (*Id.* at 19-20 (citing Pl.'s 56.1 ¶¶ 166-67).) Plaintiff also points to the June 29th Letter in which she states that during the meeting she "described all of the times [she] complained about other employees here." (*Id.* at 20.) Although Defendants challenge Plaintiff's evidence on these points, (*see* Reply at 6-7), the court must view Plaintiff's evidence "in the light most favorable" to her at this stage, *Young*, 575 U.S. at 216. Additionally, "choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." *Rem*, 38 F. 3d at 644. Based on Plaintiff's evidence, "a reasonable jury" could find that she identified to the Center the specific employees that she mentioned. *City of Waterbury*, 542 F.3d at 35.

The question then becomes whether the Center "failed to respond to complaints" such that it could be found to be "negligent in failing to prevent harassment from taking place." *Vance*, 570 U.S. at 448-49 (2013). Defendants assert that the Center's response to Plaintiff's complaints, which included meetings and investigations, was reasonable. (Def.'s Mot. at 20.) Plaintiff contends that the Center "elected to look the other way, allowing harassment to go unchecked" in response to her complaints. (Pl.'s Opp. at 17.) For example, Plaintiff testified that at the June 2022 meeting where she shared complaints, she was told that nothing could be done about her complaints because it was not possible to "ban everybody" and points to testimony from Sabo, Benjamin, and Greenberg that there were no next steps taken after the meeting. (Pl.'s 56.1 ¶¶ 71, 168-69, 172-75, 177-78; Pl.'s Opp. at 20.)

Defendants also point to the mandatory Town Halls held in response to Plaintiff's complaints, and contend that it is "inconceivable" that the Town Halls did not address Plaintiff's concerns. (Reply at 7.) They note that "[d]uring the [Town Halls], employees were retrained on anti-discrimination and anti-harassment policies, and employee tolerance and acceptance." (Def.'s Mot. at 20 (citing Def.'s 56.1 ¶ 74).) Plaintiff maintains that such topics were merely "talking points" for the Town Hall, and that the only topics discussed were "lateness" and "abuse." (Pl.'s Opp. at 21 (citing Pl.'s 56.1 ¶¶ 206-208).) She also points to Greenberg's testimony that the Town Halls were held just "to show [Plaintiff] that we're doing something." (*Id.* (citing Pl.'s 56.1 ¶ 209).) She also testified that before the Center agreed to hold the Town Hall, Greenberg told her "if you're feeling that [the Center] is not a safe place for you to work [], then you should find another place to work."[13] (*Id.* at 20 (citing Pl.'s 56.1 ¶ 169).) Plaintiff asserts that she raised further concerns to Benjamin about ongoing harassment after the Town Halls to no avail. (*Id.* at 21 (citing Pl.'s 56.1 ¶ 190).) Defendants dispute Plaintiff's narrative as to Greenberg's testimony and the topics discussed at the Town Halls. (Reply at 7-8.)

At this stage, the court must view the evidence "in the light most favorable" to Plaintiff. *Young*, 575 U.S. at 216. It suffices that Plaintiff has supported her account with evidence "that a reasonable jury" could credit. *City of Waterbury*, 542 F.3d at 35. A

[13] Defendants deny this. They contend that it would be "illogical" for Greenberg to have told Plaintiff that she should "find another place to work" if she was unhappy because he also asked during the meeting how the Center could "make this environment safer and comfortable and free of what you are going through." (Def.'s Mot. at 19 (citing Compl. ¶¶ 89, 90).) While that may be, it is a question for the jury to decide, not the court at the summary judgment stage. *See Young*, 575 U.S. at 216; *City of Waterbury*, 542 F.3d at 35.

reasonable jury could find that the Center "failed to respond" adequately to her complaints, and that the Center was "negligent in failing to prevent harassment" of Plaintiff "from taking place." *Vance*, 570 U.S. at 448-49. Additionally, "the promptness and adequacy of an employer's response is generally a question of fact for the jury." *Dobrich v. Gen. Dynamics Corp., Elec. Boat Div.*, 106 F. Supp. 2d 386, 394 (D. Conn. 2000). Thus, Plaintiff has presented a material dispute as to whether such harassing conduct could be imputed to the Center. *See Duch*, 588 F.3d at 762.

2. NYSHRL and NYCHRL Claims

Plaintiff also presents adequate claims under the NYSHRL and the NYCHRL. "Hostile work environment claims under Title VII and the NYSHRL are governed by the same standard."[14] *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) (citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013)). And the NYCHRL has a "uniquely broad and remedial purpose," and its provisions "shall be construed liberally." *Id.* § 8-130; *see Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 114 (2d

[14] Defendants claim that the standard under the NYSHRL is "higher" than under Title VII for hostile work environment claims based on nonsupervisory employees' conduct. (Def.'s Mot. at 16.) That framing is misleading. Defendants are correct that under the NYSHRL, "an employer may not be liable for a nonsupervisory employee's discriminatory conduct under the NYSHRL unless it "encouraged, condoned, or approved it." *Cornelius v. Moody's Invs. Serv., Inc.*, 224 N.Y.S.3d 46, 48 (1st Dep't 2024); *Hoit v. Capital Dist. Transp. Auth.*, 805 F. App'x 41, 44 (2d Cir. 2020) (summary order) (stating the same). But as another court in this district has explained, *Cornelius* does not impose a heightened standard. It merely affirms that following NYSHRL's 2019 amendments, employer liability for a hostile work environment "depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Trapani v. Freeport Pub. Sch. Dist.*, No. 24-CV-3005 (JS) (SIL), 2025 WL 2306658, at *8 (E.D.N.Y. May 2, 2025) (emphasis added) (quoting *Maiurano v. Cantor Fitzgerald Sec.*, No. 19-CV-10042 (KPF), 2021 WL 76410, at *5 (S.D.N.Y. Jan. 8, 2021)).

Cir. 2013). "For a hostile work environment claim under the NY-CHRL to survive summary judgment," a plaintiff "need only show the existence of unwanted [discriminatory] conduct." *Menos v. Uncle Nearest, Inc.*, No. 22-CV-1449 (PKC) (PK), 2025 WL 917347, *9 (E.D.N.Y. Mar. 25, 2025). Plaintiff's Title VII showing satisfies the NYSHRL's identical standard and clears the NY-CHRL's lower bars, and she therefore raises triable issues under both statutes. *See Smith*, 790 F.3d at 439; *Mihalik*, 715 F.3d at 114.

* * *

In sum, Plaintiff has raised a genuine dispute of material fact to survive summary judgment on her hostile work environment claims.

### C. Retaliation Claims

Plaintiff's retaliation claims focus on the Center's purported decision to terminate her employment for reporting discriminatory comments and actions directed at her. The court addresses Plaintiff's Title VII retaliation claim first, followed by her NYSHRL and NYCHRL claims.

#### 1. Title VII Claim

"Although retaliation claims under Title VII are governed by 42 U.S.C. § 2000e-3, rather than § 2000e-2, which governs discrimination claims, the *McDonnell Douglas* framework" still applies to them. *Carr v. New York City Transit Auth.*, 76 F.4th 172, 178 (2d Cir. 2023). "[T]o establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity [under Title VII], (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Id.* at 180. A plaintiff can establish this final element either "directly, through evidence of

retaliatory animus" toward the plaintiff, or "indirectly," through "circumstantial evidence." *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 240 (2d Cir. 2024) (quoting *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)).

As in the discrimination context, "a defendant may rebut a prima facie showing of retaliation by providing a legitimate, non-retaliatory reason for the allegedly retaliatory action." *Carr*, 76 F.4th at 178 (citing *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015)). If it does so, the plaintiff then "must show a connection between the protected activity and the adverse action, that is, that the retaliation was a 'but-for' cause of the employer's adverse action.'" *Namibar*, 158 F.4th at 367 (quoting *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023)); *see Ya-Chen*, 805 F.3d at 70; *Carr*, 76 F.4th at 178.

Plaintiff has established a *prima facie* case under this standard. Both sides appear to agree that she engaged in protected activity by complaining to the Center about the discriminatory harassment she faced from fellow employees. (*See* Def.'s Mot. at 22-23; Pl.'s Opp. at 23 n.4; Reply at 8.) Regarding the fourth element, Plaintiff testified that she complained to Powell during her altercation with McNeil (which occurred a week before she was terminated) that McNeil had called her a "f**king f*gg*t" and a "gay a*s." (Pl.'s Opp. at 24 (citing Pl.'s 56.1 ¶ 196); *see also* Pl.'s 56.1 ¶ 196.) The Center contends that Plaintiff has failed to provide any "contemporaneous evidence" that she complained specifically about McNeil's discriminatory remarks during their altercation. (Reply at 9; *see* Def.'s Mot. at 23.) Instead, Defendants note that Plaintiff's written report merely stated that McNeil was "screaming and using profanity." (Reply at 9; *see also* Def.'s R. 56.1 Counter Stmt. ¶ 192-94.) Defendants argue that even if Plaintiff complained verbally to Powell about such statements, she has provided "no evidence that Powell relayed any such complaint to Benjamin or any other decisionmaker." (Reply at 9.;

Def.'s 56.1 ¶ 45.) However, a reasonable jury could conclude that Plaintiff complained to Powell verbally prior to her termination, thus "establish[ing] a causal connection to support a [] retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action."[15] *Banks*, 81 F.4th at 277 (internal quotation omitted).

Nevertheless, Defendants raise a legitimate, non-retaliatory reason for terminating Plaintiff. Defendants contend that their decision to terminate Plaintiff was based on her behavior during the altercation with McNeil and her "substantial" prior disciplinary record. (Def.'s Mot. at 24.) Given the evidence cited by Defendants in support of this explanation, it suffices to rebut her retaliation claim just as it did her discrimination claim. (*See id.* at 14-16 (citing Def.'s 56.1 ¶¶ 37, 39-43, 45).)

As with Plaintiff's discrimination claim, she has failed to rebut the Center's proffered non-discriminatory explanation for its action. "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013); *Namibar*, 158 F.4th at 367. Other than temporal proximity, Plaintiff has provided no affirmative evidence to show that she would not have been terminated "but for" reporting McNeil's—or anyone else's—comments. (Reply at 8-9 (citing Pl.'s Opp. at 23-24).) Accordingly, the court must dismiss her Title VII claim.

2. NYSHRL and NYCHRL Claims

The NYSHRL and the NYCHRL "employ a more liberal standard" than Title VII for retaliation claims. *Edelman v. NYU Langone*

---

[15] Given that Plaintiff has presented adequate evidence of her complaints about McNeil to Powell to survive summary judgment, the court declines to consider her alternative argument that her complaints to the Center eight months prior to her termination "can still be actionable under Title VII." (Pl.'s Opp. at 24.)

*Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025) (quoting *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122-23 (2d Cir. 2024) (applying same standard at summary judgment for retaliation claims under the NYSHRL and the NYCHRL)). To establish a *prima facie* case under those statutes, however, a plaintiff must still "demonstrate that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Id.* Like under Title VII, a defendant can rebut a plaintiff's *prima facie* case with "legitimate [non-retaliatory] reasons for its actions." *Id.* (quoting *Ya-Chen*, 805 F.3d at 75-76). The burden then shifts back to the plaintiff to show "either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." *Id.* (quoting *Ya-Chen*, 805 F.3d at 75-76 (collecting cases for the NYCHRL standard)); *see also id.* at 45 n.9 (citing *Qorrolli*, 124 F.4th at 122-23 to apply the same standard to the NYSHRL).

Even under the "more liberal" NYSHRL and NYCHRL, Plaintiff has failed to rebut Defendants' proffered "legitimate reasons for its actions." *See Edelman*, 141 F.4th at 45 (quoting *Qorrolli*, 124 F.4th at 122-23; *Ya-Chen*, 805 F.3d at 75-76). As under Title VII, "evidence of temporal proximity alone is not enough to demonstrate retaliation under the NYCHRL." *Forrester v. Corizon Health, Inc.*, 752 F. App'x 64, 66 (2d Cir. 2018) (summary order); *see Ya-Chen*, 805 F.3d at 76-77 (affirming a grant of summary judgment when an NYCHRL retaliation plaintiff's sole rebuttal to a defendant was that her adverse employment decision "came soon after" her complaint at issue). Given that the NYSHRL applies the same standard, it yields the same result. *See Qorrolli*, 124 F.4th at 122-23. Thus, under both statutes, Plaintiff fails to establish a claim for retaliation.

* * *

For the foregoing reasons, the court grants Defendants' motion for summary judgment on all of Plaintiff's retaliation claims.

### D. Aiding-and-Abetting Claims

Finally, Plaintiff brings aiding-and-abetting claims against the Individual Defendants. The court agrees that these claims must be dismissed insofar as they stem from the Center's purported discrimination and retaliation, but disagrees insofar as they stem from the Center's hostile work environment.

The NYSHRL makes it an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce" an employer to discriminate or unlawfully retaliate, "or attempt to do so." N.Y. Exec. Law § 296(6). The NYCHRL has "virtually identical" language. *Williams v. New York Housing Auth.*, 61 F.4th 55, 76-77 (2d Cir. 2023) (quoting *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004)); *see* N.Y.C. Admin. Code § 8-107(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so.") Thus, the "same standards" apply to claims under both statutes. *Williams*, 61 F.4th at 76-77 (quoting *Feingold*, 366 F.3d at 158). Under those standards, a co-worker who "actually participates in the conduct giving rise to a discrimination claim" is liable even if "that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold*, 366 F.3d at 158.

Under the NYSHRL or the NYCHRL, an individual can only be found liable for aiding and abetting acts of discrimination if the plaintiff first establishes the employer's liability. *Stidhum v. 161-10 Hillside Auto Ave., LLC*, No. 21-CV-07163 (OEM) (LB), 2025 WL 327973, at *11 (E.D.N.Y. Jan. 29, 2025) (citing *Falchenberg v. N.Y.S. Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009) (summary order)); *De Figueroa v. New York*, 403 F. Supp. 3d 133, 163 (E.D.N.Y. 2019). As such, Plaintiff's failure to raise triable claims

for discrimination and retaliation necessitates the same outcome for aiding-and-abetting liability under those claims.

Plaintiff has, however, presented a genuine dispute of material fact as to her hostile work environment claims against the Center. "A supervisor's failure to take adequate remedial measures in response to a complaint of discrimination can . . . constitute actual participation." *McHenry v. Fox News Network*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) (quoting *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 555 (S.D.N.Y. 2014)). Viewing the evidence "in the light most favorable to" Plaintiff, *Young*, 575 U.S. at 216, a reasonable jury could find that each individual defendant "actually participate[d]" in the same conduct, *Feingold*, 366 F.3d at 158. The Individual Defendants all testified that they were aware of Plaintiff's numerous complaints. (Pl.'s Opp. at 25 (citing Pl.'s 56.1 ¶¶ 98-100, 103-06, 108-09, 113, 130-37, 140, 142, 156-57, 160, 164, 166-67, 170); Def.'s Mot. at 8 (citing Def.'s 56.1 at ¶¶ 58-61).) Plaintiff has raised a genuine dispute regarding whether Defendants took meaningful remedial measures to address or eliminate the hostile work environment that she faced. (Pl.'s Opp. at 25-26 (citing Pl.'s 56.1 ¶¶ 143-48, 150-59, 160-65, 171, 186-89).)

The court grants Defendants' motion for summary judgment as to Plaintiff's aiding-and-abetting claims pertaining to discrimination and retaliation, but denies their motion as to Plaintiff's aiding-and-abetting claims pertaining to her hostile work environment claim.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS IN PART Defendants' motion for summary judgment against Plaintiff regarding her discrimination and retaliation claims. It DENIES IN PART Defendants' motion regarding Plaintiff's hostile work environment

claims. Similarly, the court GRANTS IN PART Defendants' motion regarding Plaintiff's aiding-and-abetting claims stemming from discrimination and retaliation, but DENIES IN PART Defendants' motion regarding her aiding-and-abetting claims stemming from a hostile work environment.

The court DIRECTS the parties to appear before the assigned magistrate judge for the preparation of a joint pre-trial order.

SO ORDERED.

Dated: Brooklyn, New York
October 9, 2026

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge